BRENDA F. O'CONNOR, DONALD W. O'CONNOR AND JENNIFER RENEE CUMMINGS, A MINOR, BY HER GUARDIAN AD LITEM, BRENDA F. O'CONNOR v. CORBETT LUMBER CORPORATION

No. 865SC601

(Filed 3 February 1987)

**Master and Servant § 34.2; Convicts and Prisoners § 2— work release inmate—no liability by employer for crimes**

An employer does not owe a duty to protect third persons from the criminal acts of a work release inmate acting outside the scope of his employment. Therefore, defendant employer was not liable on the theory of negligent supervision of a work release inmate employee for personal injury and property damage allegedly caused by the inmate's rape and other crimes committed against a third person which did not occur on the employer's premises.

APPEAL by plaintiffs from *Stevens, Judge.* Judgment filed 24 February 1986 in Superior Court, NEW HANOVER County. Heard in the Court of Appeals 12 November 1986.

O'Connor v. Corbett Lumber Corp.

This is a civil action for personal injury and property damage allegedly caused by defendant's negligent supervision and control of a work release inmate employee.

The essential facts are:

On 11 September 1979 Ronald Hammond was convicted of felony assault with a deadly weapon on a police officer and misdemeanor assault on a female. He was sentenced to the State Department of Corrections (DOC) for a term of three to five years on the felony and one to two years on the misdemeanor, to be served consecutively. In August 1980 Hammond was transferred to the New Hanover minimum security unit in Wilmington. In March 1981 Hammond was approved by the Parole Commission for work release. In April 1981 Hammond was elevated to Level IV Classification which enabled him to participate in the work release program. Through the program, Hammond was employed by defendant Corbett Lumber Company and began work on 16 April 1981.

At that time, it was the policy of the New Hanover prison unit, approved by the DOC area administrator, to allow prisoners on work release who worked within a close proximity to the prison unit to walk unescorted to and from work. Corbett Lumber Company was considered by prison officials to be within walking distance of the unit. Hammond was permitted to walk along Blue Clay Road to and from work each day. The route routinely taken bordered a residential neighborhood where plaintiffs lived.

On 20 July 1981 Hammond checked out of the prison at 7:00 a.m. and walked to work at Corbett Lumber. He was expected to return to the prison unit by 4:30 p.m. On two occasions that morning, Hammond informed his supervisor that he felt ill and wanted to return to the prison unit. Samuel David Mitchell, Hammond's supervisor at Corbett Lumber Company, testified he telephoned the prison unit and reported that Hammond was returning. According to the statement of the unit chief, Sam Stallings, correctional officer Darrell Brake recalled receiving a call sometime between 12:00 noon and 1:45 p.m. from a supervisor of inmates on a work release job that an inmate was coming in early, giving the name of the inmate and the work site. He recalled relaying the information to Officer Mellor, the control officer in charge of keeping up with the prisoner count and the keys. Officer Mellor had

no recollection of the message. On further inquiry Brake could not remember the inmate's name, the supervisor's name or the name of the work site. Brake did remember that it was a work site where the inmates walk to and from work because he recalled having had no questions about the inmate returning to the unit.

By deposition, Laura Overstreet, a DOC program assistant with responsibilities in the work release program at the unit, testified that another officer at the unit, Sergeant Donald Lee, had received a call from Corbett Lumber Company about Hammond coming in early. The call was transferred to Bobby Roberts, a program supervisor at the unit.

After leaving Corbett Lumber, Ronald Hammond did not return to the prison unit. Sometime between 12:30 p.m. and 3:00 p.m. he broke into plaintiffs' house at 234 Jamaica Drive, just off Blue Clay Road. Brenda O'Connor (then Brenda Cummings) left work that day at approximately 3:00 p.m. and drove to a nursery school to pick up her daughter. They arrived home at 234 Jamaica Drive approximately 3:15 p.m. Upon entering the house Brenda O'Connor was grabbed from behind by Hammond and thrown against the wall. Shortly thereafter, Donald O'Connor (who was then Brenda O'Connor's fiance) entered the house. During the next several hours, until approximately 6:00 p.m., Brenda O'Connor was assaulted and raped by Hammond in the presence of her fiance and minor daughter. Before leaving, Hammond took money from Brenda O'Connor's wallet, her ring and some other jewelry. He then took the keys to Mrs. O'Connor's car and drove away.

Plaintiffs filed their complaint on 16 July 1984 alleging that defendant was negligent in permitting Hammond to leave the work site without proper supervision and without properly notifying the prison unit or requiring prison officials to "properly secure the person of Hammond under the existing circumstances." Defendant's motion for summary judgment was granted by the trial court. Plaintiffs appeal.

*Ellis, Hooper, Warlick, Waters & Morgan by John Drew Warlick, Jr. and James L. Nelson for plaintiff-appellants.*

*White & Allen, by John R. Hooten, John C. Archie and John M. Martin for defendant-appellee.*

EAGLES, Judge.

By their sole assignment of error plaintiffs contend that the trial court erred in allowing summary judgment for the defendant.

Plaintiffs seek to recover damages based on defendant's independent negligence in supervising and controlling the work release inmate employee. Plaintiffs do not contend that defendant is liable for the negligence of its inmate employee under the doctrine of *respondeat superior*. Summary judgment for the defendant in a negligence action is proper where the evidence fails to show negligence on the part of the defendant. *Hale v. Power Co.*, 40 N.C. App. 202, 252 S.E. 2d 265 (1979). Strictly speaking, the concept of negligence is composed of two elements: legal duty and a failure to exercise due care in the performance of that legal duty. *Barnes v. Caulbourne*, 240 N.C. 721, 83 S.E. 2d 898 (1954). Due care always means the care an ordinarily prudent person would exercise under the same or similar circumstances when charged with a legal duty. What is meant by legal duty, however, varies according to subject matter and relationships. *Id.* What is negligence is a question of law and when the facts are not disputed, the court must say whether negligence does or does not exist. *Hudson v. Transit Co.*, 250 N.C. 435, 108 S.E. 2d 900 (1959).

Since the facts are not disputed here, the question before us is whether an employer owes a duty to protect third persons from the criminal acts of a work release inmate employee acting outside the scope of his employment. This is a case of first impression in North Carolina. Our research reveals that only one other state has addressed the issue. In *Roberson v. Allied Foundry & Machinery Co.*, 447 So. 2d 720 (Ala. 1984), a convenience store cashier brought a negligence action against the employer of two work release inmate employees who robbed and assaulted her. The plaintiff asserted that the employer had a duty to supervise its work release employees so as to protect plaintiff from their criminal actions. Plaintiff argued that a "special relationship exists between an employer and his work release employees by virtue of the fact that they are state inmates, with criminal propensities" and asked the Alabama Supreme Court to adopt a rule of "special duty" on the part of employers who hire work release

inmates to supervise and control those employees outside the scope of their employment. *Id.* at 722.

The Alabama Supreme Court declined to adopt the "special duty" rule, finding no authority or justification for the premise that a special relationship exists between an employer and its work release inmate employees sufficient to impose a duty to supervise the work release employees outside the scope of their employment. *Id.* at 723.

> Work release inmates are certified to the employer by the State Board of Corrections to be "non-dangerous." Also, employers are instructed by the Board to treat work release employees in the same manner as other employees and to apply the same policies with them as with other employees. Except with regard to a few restrictions imposed by the Board on employers and work release employees, those employees stand in the same relationship with their employers as non-inmate employees. We cannot justify a finding of a special relationship in this case on the bare fact that work release employees are state inmates.

*Id.* at 722. Further, the court believed that its decision was consistent with the general rule that "one has no duty to protect another from criminal attack by a third party." *Id.* at 722-23.

As a general rule "[n]o person owes a duty to anyone to anticipate that a crime will be committed by another, and to act upon that belief." 57 Am. Jur. 2d *Negligence* Section 63 (1971). However, a duty to afford protection of another from a criminal assault or willful act of violence of a third person may arise, at least under some circumstances, if that duty is voluntarily assumed. *Id.* In the situation of employer-employee relationships under the doctrine of *respondeat superior* an employer may be held liable for the criminal act of his employee if the act was authorized by the employer prior to its commission, ratified after its commission, or committed within the scope of the employment. 53 Am. Jur. 2d *Master and Servant* Section 445 (1970). For employees' criminal acts not authorized, ratified or committed within the scope of employment, employers have been held independently liable under the doctrine of negligent hiring or retention of incompetent or unfit employees. See generally Annot., 48 A.L.R. 3d 359 (1973) and cases cited therein. There the theory of

O'Connor v. Corbett Lumber Corp.

liability is that the employer's negligence is a wrong to third persons, entirely independent of the employer's liability under the doctrine of *respondeat superior. Id.*

Here, plaintiffs argue independent liability but not on the basis of any theory of negligent hiring or retention. Instead plaintiffs argue that by accepting work release prisoners as employees, the defendant employer also accepts the duty and responsibility to control and supervise these prisoners while they are away from the prison unit. Plaintiffs rely on a Department of Corrections work release pamphlet entitled: "WORK RELEASE A Summary of Guidelines for Employers." The pamphlet which is distributed to all work release employers states that the "intent of the work release law is that the inmate be under supervision when outside the prison facility. When the inmate is actively engaged in the work release program, this supervision must be provided by the employer."

We agree with plaintiffs that employers of work release inmates do take on the responsibility to supervise those inmates while on the job. The DOC pamphlet provides ten specific guidelines to assist employers in understanding the responsibility of both the employer and the inmate in the work release program. Guideline #3 specifically provides that inmates must be observed on an hourly basis:

> 3. The inmate is to be under supervision of the employer, a foreman, or a civilian working at a similar job at all times. The inmate is not to be assigned to any position where observation cannot occur at least on an hourly basis.

However, we do not agree with plaintiffs that when an employer hires a work release inmate, nothing else appearing, the hiring employer's responsibility to supervise the inmate employee extends to activity outside the inmate employee's scope of employment.

Guideline #2 provides that an inmate is not to leave the job site for any reason unless authorized to do so by prison officials. In the event the nature of the job requires the inmate to leave the job site or the employer desires to change the work schedule, *the employer* should make suitable arrangements with prison officials. Guideline #4 states that in the event work ceases before

the end of the shift, the inmate is to return immediately and directly to the prison unit. If scheduled transportation is not available, *the employer* or his representative should call the prison and ask for transportation. In the event there is reason to believe that an inmate has left the job site without authorization or has escaped, *the employer* is directed to notify the officer in charge of the prison facility immediately. Other guidelines tell employee inmates that they are not to possess or use alcoholic beverages or controlled substances; not to leave the state; not to operate any motor vehicles unless authorized by prison officials; not to receive any visitors and not to engage in any improper activity.

Nothing in the guidelines suggests that an employer takes on any duty or responsibility to control or supervise the inmate employee when he is not on the job or at the job site. The employer is obliged only to notify prison officials if the work schedule changes, if the inmate employee is to leave the job site before the end of the shift or in the case of escape or unauthorized absence. In the event of any one of these occurrences, the employer's responsibility is limited to notifying the prison officials in charge. Indeed, from the testimony in the record taken from prison officials' depositions the employer has no authority to control a work release inmate by way of arrest. If an employee leaves the job site without authorization or escapes, the employer should not go after the inmate or try to stop him from leaving.

Transportation of work release inmates to and from work is the responsibility of the Department of Corrections. "The Department of Correction is responsible for the actual placement of inmates on the work release program and for their housing, transportation and supervision, as well as for the collection and disbursement of all monies earned by them." 5 N.C. Admin. Code 4E Section .0107 (1981). Pamphlet Guideline #1 states that the inmate is to proceed each work day directly from the place of confinement to the work site by "the approved route and method of transportation." Guideline #4 provides that at the end of the work day or shift the inmate is "to return immediately and directly to the place of confinement." In this case the "approved route and method of transportation" for Ronald Hammond was for him to walk *to and from* work on a route that took him by the residential neighborhood where plaintiffs resided. The DOC area administra-

tor approved the policy which allowed inmates to walk to and from work and the route Ronald Hammond took was approved by prison officials.

To support their argument that employers have a duty to control inmates outside the scope of their employment, plaintiffs rely on Restatement (Second) of Torts Section 319 (1965) and *Semler v. Psychiatric Institute*, 538 F. 2d 121 (4th Cir. 1976). Restatement (Second) of Torts Section 319 provides as follows:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Comment *a* states that this rule applies to two situations: (1) where "the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal" and (2) where the "actor has charge of a third person who does not belong to such a class but who has a peculiar tendency" to act injuriously and the actor knew of this peculiar tendency. We do not believe that the facts presented in this case fall into either one of these two situations. Section 319 does not apply to the facts of this case because Section 317 specifically states the conditions under which an employer has the duty to control the conduct of an employee acting outside the scope of his employment:

> A master is under a duty to exercise reasonable care so to control his servant *while acting outside the scope of his employment* as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>
> (ii) is using a chattel of the master, and
>
> (b) the master
>
> (i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

Here, however, the employee's criminal act did not occur while on the employer's premises or while the employee was using the employer's property and hence, no duty to control the employee acting outside the scope of his employment may be imposed under this section of the Restatement.

In *Semler v. Psychiatric Institute, supra*, a negligence action was brought against a psychiatric institute and a psychiatrist to recover damages for the death of a girl killed by a Virginia probationer while an outpatient at the institute. The probationer received a 20 year sentence for abduction, suspended on the condition that he be confined to the institute for treatment until released by the court. After some time, the doctor in charge placed the probationer on out-patient status without court approval or release. The Fourth Circuit held that the special relationship created by the probation order imposed a duty on the defendants to protect the public from reasonably foreseeable harm at the hands of the probationer. 538 F. 2d at 125. Relying somewhat on Section 319, the court found that section to measure a "custodian's" duty by the standard of reasonable care and that the standard was defined by the probation order. *Id*.

Here, there is nothing in the record to establish any "custodial" duty on the part of the work release employer. Upon Hammond's conviction in 1979 he was placed in the custody of the Department of Corrections. G.S. 148-6. As stated earlier, the Department is responsible for placement, housing, transportation and supervision of work release inmates. 5 N.C. Admin. Code 4E Section .0107. When inmates enter the work release program they remain "under the actual management, control and care of the Department." G.S. 148-6. Factual distinctions between this case and *Semler, supra*, make it unpersuasive here.

Like the Alabama Supreme Court in *Roberson, supra*, we too decline, on these facts, to adopt a rule that requires employers of work release inmates to supervise and control the inmate employees outside the scope of their work release employment. Here Ronald Hammond was approved and recommended for work release by the Department of Corrections. As part of the approval process he was psychologically tested and cleared as pos-

ing no danger to society. Except for the restrictions imposed on employers as stated in the work release pamphlet guidelines, work release inmates stand in the same relationship with their employers as non-inmate employees. Indeed, employers are instructed to treat work release inmates the same as they treat non-inmate employees with respect to the duties given to them.

It is clear from the record that Hammond was observed at least on an hourly basis by his supervisor while on the job. On the day in question, Hammond twice informed his immediate supervisor that he was sick and wished to return to the unit. The supervisor called the prison unit and informed the officer who answered that Hammond was ill and was returning to the unit. The inmate guidelines contained in the work release pamphlet do not specify procedures to be followed when an inmate is ill. However, Guideline #4 states that if work ceases before the end of the shift, the inmate is to return immediately to the prison unit. "If scheduled transportation is not available, the employer or his representative should call the prison and ask for transportation." Here there was no "scheduled transportation" because at the end of every work shift Hammond walked back to the unit. The program assistant in charge of work release at the New Hanover prison unit testified that if an inmate became ill on the job, the employer was to call the prison unit and inform them of the illness. If the inmate was too sick to return by the approved method of transportation, the unit would arrange to pick him up. If the inmate was not too sick to return by the approved method of transportation, the inmate was expected to return by that approved method. In the case of an inmate who walked to and from work, if he was not too sick to walk then he was expected to walk back to the unit.

Based on the record before us, we are not persuaded that defendant employer here owed a legal duty to the plaintiffs to protect them from the criminal acts of its work release inmate employee. Since defendant Corbett Lumber Company owed no duty to the plaintiffs, summary judgment was appropriate.

Affirmed.

Judges ARNOLD and JOHNSON concur.